## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

TASHA M. ROMERO,

        Plaintiff,

v.                                   No. CV-11-0711 CG

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

### MEMORANDUM OPINION AND ORDER

    **THIS MATTER** comes before the Court on Plaintiff Tasha M. Romero's *Motion to Remand Pursuant to Sentence 6 of 42 U.S.C. § 405(g) or in the alternative, Motion to Reverse and Remand for a Rehearing With Supporting Memorandum*, (Doc. 23), Defendant's *Response to Plaintiff's Motion to Remand Pursuant to Sentence 6 of 42 U.S.C. § 4015(g)* [sic] *or in the alternative, Motion to Reverse or Remand for a Rehearing*, (Doc. 24), and Plaintiff's *Reply to Response to Plaintiff's Motion to Remand Pursuant to Sentence 6 of 42 U.S.C. § 405(g) or in the alternative, Motion to Reverse or Remand for a Hearing*, (Doc. 25).

    Ms. Romero applied for supplemental security income on August 26, 2008, and her application for SSI benefits was rejected by Administrative Law Judge ("ALJ") Jack Raines on June 24, 2010. Administrative Record ("AR") at 12. Ms. Romero contends that the ALJ's decision should be overturned because new evidence has emerged which would likely have changed the outcome of the case. (Doc. 23 at 1-3). In the alternative, she claims the case should be remanded because the ALJ's findings regarding her residual functional capacity ("RFC") were not supported by substantial evidence. (*Id.* at 11-13). She also

argues that the ALJ failed to properly account for her obesity in formulating her RFC, that the ALJ's hypothetical question to the Vocational Expert was incomplete, and that the ALJ's credibility determination was flawed. (*Id.* at 14, 16-18). The Commissioner maintains that the ALJ applied the correct legal standards and that his findings were supported by substantial evidence. (Doc. 24 at 4-17).

Having considered the parties' filings, the relevant law, and having meticulously reviewed and considered the entire administrative record ("AR"), the Court finds that the ALJ's RFC determination was not supported by substantial evidence. Therefore, the Court will **GRANT** Ms. Romero's motion and **REMAND** the case to the Commissioner.

## I.    Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)).  If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief.  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760.  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.  While a court may not re-weigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.   Applicable Law and Sequential Evaluation Process

For purposes of disability insurance benefits (DIB) and supplemental security income (SSI), a person establishes a disability when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a).

In light of this definition for disability, a five-step sequential evaluation process (SEP) has been established for evaluating a disability claim.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the SEP, the claimant has the burden to show that:  (1) he is not engaged in "substantial gainful activity." At the second step, the claiming must show that (2) he has a "severe medically

determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) his impairment(s) either meet or equal one of the "Listings"[1] of presumptively disabling impairments; or (4) he is unable to perform her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.  At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity (RFC), age, education, and work experience.  *Grogan*, 399 F.3d at 1261.

### III.   Background

#### a.   Medical Background

Ms. Romero is a 24 year old woman who has suffered from a variety of mental and physical ailments over the last several years. At the age of 15 she broke her jaw in three places and dislocated both temporomandibular joints during a four-wheeler accident. AR 45-46. She underwent surgery to repair the jaw fractures and had a metal plate and wires inserted into her chin. *Id.* at 45-46, 709. Shortly after the surgical repair Ms. Romero began to experience tinnitus, severe headaches, and jaw pain on a daily basis. *Id.* at 46-47. She was diagnosed with temporomandibular joint synrdome ("TMJ") and has been taking pain narcotic medications in an effort to treat the symptoms. *Id.* at 51, 716. She claims that the medications cause significant side effects including dizziness, nausea, and fatigue. *Id.* at 39-40. The physical impairments have been aggravated by her obesity and by chronic obstructive pulmonary disorder ("COPD"), which has worsened due to Ms. Romero's heavy

---

[1] 20 C.F.R. pt. 404, subpt. P, app. 1.

4

smoking habits. She also has a significant history of drug and alcohol abuse. *See, e.g., Id.* at 21-26 (ALJ briefly recapped hospital visits and police arrests relating to Ms. Romero's alcohol and drug consumption).

Ms. Romero also suffers from mental impairments, including anxiety, depression, and agoraphobia, which prevent her from maintaining social relationships and stable employment. Dr. Jasmin Breitung, Ms. Romero's treating physician, began treating her in January of 2008 and has seen her at least once a month since then. *Id.* at 49-50. Dr. Breitung is both a psychiatrist and a doctor of internal medicine so she has treated both her physical and mental symptoms. Dr. Breitung initially diagnosed Ms. Romero with Major Depressive Disorder and Dysthymia.[2] *Id.* at 342. Her treatment notes indicate that Ms. Romero experienced crying spells and frequent panic attacks. *Id.* at 666, 670-71, 673-74. Dr. Breitung noted that Ms. Romero had attempted suicide in the past and she found her to be extremely anxious. *Id.* at 344. She assigned Ms. Romero a Global Assessment of Functioning ("GAF") score of 50.[3] In early 2009, Dr. Breitung supplemented her diagnosis to include Agoraphobia with occasional panic attacks and generic anxiety disorder. *Id.* at 334.

Ms. Romero reported to Dr. Breitung that she was continually anxious around people and that she was so anxious at work that she was forced to quit. *Id.* at 336, 671, 674.

---

[2] Dysthymia is characterized as a "chronic type of depression in which a person's moods are regularly low. However, symptoms are not as severe as with major depression." *See* U.S. National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/

[3] The GAF scale is used by doctors and considers a patient's psychological, social, and occupational functioning. A GAF score between 41-50 indicates serious impairments in social and occupational functioning and suggests an in ability to keep a job. *See* Diagnostic & Statistical Manual of Mental Disorders at 384 (4th ed. American Psychiatric Society, 2000).

Despite her treatment with Dr. Breitung, Ms. Romero's anxiety and agoraphobia continued to worsen and Ms. Romero began to isolate herself. By late 2009, Ms. Romero claimed that she rarely left her house because of her anxiety disorder. She was incapable of even taking her young daughter to a park next to her house to play. *Id.* at  39, 41-42. Dr. Breitung attempted to treat Ms. Romero's mental health disorders with a combination of psychotherapy and medication. *Id.* at 48-49.

> **b.**   **Administrative Hearing**

Ms. Romero went before ALJ Raines for a hearing on January 27, 2010. She testified about her medical problems, describing her jaw pain and headaches and her anxiety disorder and agoraphobia. *Id.* at 38-48, 50-52. She testified to her work attempts over the last several years, stating that she had been unable to keep jobs as a waitress and telemarketer primarily because of her pain and anxiety disorder. *Id.* at 37-39, 44-45. She testified that the work environment made her very anxious and that it would cause her to start hyperventilating. *Id.* at 38-39. She began to miss time from work because of her anxiety; she would either call in sick or would  deliberately fail to return from breaks on time. *Id.* at 38-39, 44-45. She would typically miss one day out of the work week because of these symptoms and, even when she did go to work, she would usually miss about one hour out of the workday. *Id.* at 45. Her anxiety continued to worsen after she was fired from her waitress and telemarketing job. By the time of the hearing,  Ms. Romero only left her house for appointments with Dr. Breitung. She would not even go to the grocery store and she relied on her family to shop for her and her three year old daughter. *Id.* at 39, 41-42, 47-50.

A vocational expert ("VE"), Shelly Eike, was present and testified at Ms. Romero's

hearing. The ALJ presented a hypothetical to the VE which he felt adequately tracked Ms. Romero's limitations. The hypothetical was for a woman of similar age, education and vocational background as Ms. Romero who could carry or lift twenty pounds occasionally and ten pounds frequently. *Id.* at 53. She could both sit, stand, and walk for approximately six hours out of an eight hour work day. *Id.* She could occasionally balance and could frequently kneel, crouch, crawl and stoop. *Id.* She had no visual or communicative limitations but should not work around heavy machinery, unprotected heights, or climb scaffolds, ropes, or ladders. *Id.* She was capable of understanding and remembering short, simple instructions and could make simple work-related decisions. *Id.* She could interact appropriately with coworkers and supervisors in a simple routine work environment, but was limited to only incidental contact with the public. *Id.* at 53-54. She was capable of responding to changes in a simple work environment. *Id.* at 54.

Based on the ALJ's hypothetical, the VE testified that Ms. Romero was incapable of performing her past relevant work. *Id.* She found that there were other jobs Ms. Romero could perform, including that of a cleaner/housekeeper, marking clerk, and some unskilled hand packaging jobs. *Id.* All three jobs were considered light, unskilled work, and all three jobs were available in the both the national and New Mexico economy. *Id.* at 54-55. Ms. Romero's attorney asked the VE whether Ms. Romero would be able to perform those jobs if she missed one hour per day or one day per week due to anxiety symptoms and the VE stated that she would probably not be able to. *Id.* at 56.

### c.   <u>Subsequent Medical Evaluations</u>

At the conclusion of the hearing, ALJ Raines stated that, prior to issuing his decision, he wanted Ms. Romero to have both a physical and mental consultative examination. *Id.*

7

at 56. Ms. Romero had been scheduled to undergo the consultative exams prior to the hearing but she had failed to appear for them. *Id.* at 32-33.

Ms. Romero underwent a mental-status examination by Warren M. Steinman, Ph.D., on April 6, 2010. *Id.* at 714. He observed that she "spoke in a monotone and was expressionless." *Id.* She related that her father was in prison through her childhood and her mother was frequently absent due to heavy substance abuse. *Id.* at 714-15. Ms. Romero began to abuse alcohol and drugs from a young age. *Id.* Ms. Romero was oriented to time and date and could follow some simple instructions but she exhibited difficulties with short-term memory and information retention. *Id.* at 716. Dr. Steinman diagnosed her with bipolar disorder, alcohol abuse, and polysubstance abuse, but ruled out post-traumatic stress disorder and personality disorder. *Id.* He found that, while she was capable of understanding and carrying out basic instructions, her mental disorders would likely result in "problems with trust and [she] may be limited markedly in relating effectively with coworkers and supervisors." *Id.* He believed she would likely have problems with authority. *Id.*

In May of 2010, Dr. Breitung completed a mental residual functional capacity assessment for Ms. Romero. *Id.* at 717. She found that Ms. Romero was moderately limited in her ability to carry out detailed instructions, to concentrate and maintain attention, to adhere to a schedule, to sustain an ordinary routine, and to work in coordination with others without being distracted by them. *Id.* She was moderately limited in her ability to work without interruptions from psychologically based symptoms, to maintain socially appropriate behavior, and to respond appropriately to changes in the work setting. *Id.* at 718. More significantly, Dr. Breitung found that Ms. Romero was markedly limited in her ability to

accept instructions, to respond appropriately to criticism from supervisors, and to get along with coworkers without distracting them or exhibiting behavioral extremes. *Id.* She described Ms. Romero as "severely limited in the work setting because of her poorly controlled panic disorder with agoraphobia . . . she has an irrational fear of crowds, [and of] interacting with people socially in the work-setting." *Id.* at 719.

### c.    ALJ and Appeals Council's Decision

ALJ Raines' issued his decision denying benefits on June 24, 2010. *Id.* at 12. He found that she had the following severe impairments: bipolar disorder, depression, anxiety, alcohol abuse, polysubstance abuse, obesity, COPD, lumbar scoliosis, headaches, and TMJ.   *Id.* at 17. His residual functional capacity assessment was identical to the hypothetical question presented to VE Eike at the hearing. *Id.* at 19. Most notably, he found that, while she could have only incidental contact with the public, she was capable of interacting appropriately with coworkers and supervisors in a simple and routine work environment. *Id.* ALJ Raines gave great weight to Dr. Steinman's opinion that  Ms. Romero was capable of understanding and carrying out basic instructions. *Id.* at 24. He further afforded great weight to the opinion that Ms. Romero had no problem concentrating on simple, sequential tasks, and short term memory tasks. *Id.* However, ALJ Raines gave little weight to Dr. Steinman's opinion that Ms. Romero may be markedly limited in her ability to interact effectively with supervisors and coworkers. *Id.* In his opinion, Ms. Romero had only testified to having difficulties interacting with the public. *Id.* ("[Ms. Romero] has made no indication she has had difficulty working with supervisors or coworkers . . . [she reports] she only has difficulty . . . interacting with the public."). In rejecting Dr. Steinman's opinion, ALJ Raines was not aware of Dr. Breitung's RFC analysis wherein she opined that Ms. Romero

9

would struggle to interact with coworkers and supervisors. Dr. Breitung's RFC analysis was completed on May 31, 2010, mere weeks before the ALJ denied benefits. *Id.* at 719. It does not appear that the ALJ had an opportunity to consider the report. *see also* (Doc. 23 at 6, n. 5).

Based on his conclusions regarding Ms. Romero's physical and mental limitations, ALJ Raines found that Ms. Romero was physically capable of performing light to moderate work. *Id.* at 23. He rejected Ms. Romero's subjective complaints of pain and anxiety when those complaints were inconsistent with his RFC analysis. *Id.* at 21. He found that her allegations regarding the severity, frequency, and intensity of her symptoms were not consistent with the medical record as a whole and were entitled to little weight. *Id.*

Ms. Romero appealed the ALJ's decision to the Social Security Appeals Council. AR at 1. She argued, *inter alia*, that the ALJ was wrong to discount Dr. Steinman's opinion regarding her ability to interact appropriately with colleagues and supervisors. *Id.* at 11. In support of her assertion, Ms. Romero submitted Dr. Breitung's RFC analysis, as well as several other medical records. *Id.* at 4-5. Notwithstanding the submission of Dr. Breitung's RFC analysis, the Appeals Council found that there was no basis for overturning the ALJ's decision *Id.* at 2. The ALJ's decision therefore became the Commissioner's final decision for the purposes of this appeal. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011).

Within several days of the Appeals Council denial, Dr. Breitung wrote another letter to Disability Determination Services in support of Ms. Romero's applications for benefits. (Doc. 23-1 at 1). She stated that, despite three years of treatment and despite Ms. Romero's compliance with her treatment plan, "nothing has achieved the results needed for [Ms. Romero] to function in the working world." (*Id.* at 1-2). Dr. Breitung stated that her

10

agoraphobia and anxiety disorder were the biggest obstacle in that they prevented her from "mingl[ing] with any type of crowd." (*Id.*) Dr. Breitung recommended that Ms. Romero be given temporary disability for one year while she continued to seek treatment. (*Id.* at 2).

**IV.   Analysis**

Ms Romero argues that her case should be remanded to the Commissioner for Social Security because, 1) Dr. Breitung's letter to Disability Determination Services likely would have changed the outcome of the disability determination, thereby necessitating a remand under sentence six of 42 U.S.C. § 405(g), 2) the ALJ failed to properly consider Ms. Romero's mental disabilities in formulating her RFC, 3) the ALJ failed to properly consider the effect of her obesity in formulating her RFC, 4) the ALJ's hypothetical question to the VE did not include all of her mental disabilities, and 5) the ALJ's credibility determination was flawed. (Doc. 23 at 1-18).

The first alleged error in the sequential evaluation process relates to the ALJ's formulation of Ms. Romero's RFC, which occurs between steps three and four of the process. 20 C.F.R. § 404.1520(a)(4). Ms. Romero claims that ALJ Raines' RFC analysis did not encompass all of the mental limitations borne out by the record. (Doc. 23 at 10-13). Specifically, she alleges that the ALJ was wrong to disregard Dr. Steinman's opinion that she may be markedly limited in her ability to interact appropriately with coworkers and supervisors. (*Id.*; Doc. 25 at 3-5). The Court concurs.

In formulating a claimant's RFC, the ALJ must consider all of the claimant's symptoms and determine the extent to which these symptoms can reasonably be accepted with the objective medical evidence. *See* 20 C.F.R. 416.929; SSRs 96-4p; SSRs 96-7p. The ALJ must therefore always consider and address medical source opinions in the

11

record. *See* SSR 96-8p.[4]  If the RFC assessment conflicts with a medical source opinion, the ALJ must explain why the opinion was not adopted. *Id.* In this case, ALJ Raines gave great weight to all of Dr. Steinman's opinions regarding Ms. Romero's mental health except for the finding that she may be markedly limited in her ability to interact with coworkers and supervisors. AR at 24. The ALJ claimed that Ms. Romero had only indicated that she had trouble interacting with the general public. *Id.*  ALJ Raines rejected Dr. Steinman's opinion regarding Ms. Romero's interactive limitations because of an absence of corroborating evidence in the record.

Ms. Romero claims that there was evidence in the record from which the ALJ could infer that she would have trouble maintaining socially appropriate relations with coworkers and supervisors. (Doc. 23 at 12). She points to medical records which indicate "that she could not leave her house, [and that] she has a documented history of altercations, both with family members, and with medical personnel." (*Id.*). The Commissioner contends that these records are equivocal at best and that they do not specifically support Dr. Steinman's conclusion regarding her ability to interact with supervisors and coworkers. (Doc. 24 at 910).

While there may not have been any medical report before the ALJ which specifically echoed Dr. Steinman's finding that Ms. Romero would be unable to interact with peers and supervisors, such a report does exist and is part of the record before this Court. As noted,

---

[4] Though social security rulings do not necessarily carry the force of law, they are entitled to deference. *See Fagan v. Astrue*, 231 F.App'x 835, 837 (10th Cir. 2007). Indeed, the particular strictures of SSR 96-8p have been explicitly endorsed by the Tenth Circuit in several unpublished opinions. *See Alexander v. Barnhart*, 74 F.App'x 23, 28 (10th Cir. 2003) (unpublished); *Southard v. Barnhart*, 72 F.App'x 781, 784 (10th Cir. 2003).

Dr. Breitung completed a 'Mental Residual Functional Capacity Assessment' for Ms. Romero mere weeks before ALJ Raines issued his decision. AR at 717. Dr. Breitung found that Ms. Romero was markedly limited in her ability to get along with work peers and supervisors. *Id.* at 718. This report was not available to ALJ Raines but it was presented to and considered by the Appeals Council. It therefore must be considered by this Court on review. *Blea v. Barnhart*, 466 F.3d 903, 908 (10th Cir. 2006) ("We note that any new evidence submitted to the Appeals Council on review becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial abuse.") (citing *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)) (internal quotations omitted). Dr. Breitung's RFC analysis directly supports Dr. Steinman's opinion and therefore provides the specific evidence of Ms. Romero's interactive limitations at work which ALJ Raines found to be lacking in the record.

Not only does Dr. Breitung's RFC finding contradict the ALJ's assessment of Ms. Romero's mental health limitations, but her opinion may be entitled to controlling weight since she is Ms. Romero's treating physician. Social Security regulations require that, in assessing a claimant's RFC, the opinions of treating physicians be given controlling weight when those opinions are supported by the medical evidence and are consistent with the record; this is known as the "treating physician rule." 20 C.F.R. § 404.1527(d)(2); *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The idea is that a treating physician provides a "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations," and therefore, a treating physician's opinion merits controlling weight. *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Even if a treating physician's

13

opinion is not entitled to controlling weight, it is still entitled to deference. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must determine how much deference to afford the opinion by using a six-factor test. *See, Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (describing the six factors); 20 C.F.R. § 404.1527(d).

Because Dr. Breitung's RFC analysis directly supports Dr. Steinman's opinion that Ms. Romero is markedly limited in her ability to interact with supervisors and coworkers, the Court finds that the ALJ's decision not to include that limitation in the RFC was not supported by substantial evidence. The case must be remanded the Commissioner for Social Security. On remand, the Commissioner should consider whether Dr. Breitung's opinion is entitled to controlling weight in accordance with the treating physician rule and whether the interactive limitations described by Dr. Breitung and Dr. Steinman should be incorporated into Ms. Romero's RFC. Because the Court finds that the ALJ erred in formulating Ms. Romero's RFC, the Court need not address her arguments with regard to the ALJ's obesity analysis, the hypothetical question, and whether Dr. Breitung's post-decision letter necessitates a remand.

**IT IS THEREFORE ORDERED** that Plaintiff Tasha M. Romero's *Motion to Remand Pursuant to Sentence 6 of 42 U.S.C. § 405(g) or in the alternative, Motion to Reverse and Remand for a Rehearing With Supporting Memorandum*, (Doc. 23), be **GRANTED**. The case is remanded to the Commissioner for Social Security for further proceedings consistent with this Order.

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent

14